IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action 19-cv-01156-MEH

MARIE DIANE DEHERRERA,

     Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Plaintiff, Marie Diane Deherrera, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83c. After consideration of the parties' briefs and the administrative record, this Court affirms the ALJ's decision and the Commissioner's final order.

## BACKGROUND

### I.    Plaintiff's Conditions

     Plaintiff was born on June 26, 1955; she was 61 years old when she filed her application for DIB and SSI. AR 221. Initially, Plaintiff claimed the onset date of her disability was December 15, 2015. AR 34. Counsel for Plaintiff sought to amend the onset date to February 1, 2016 at the ALJ hearing. *Id.* However, the ALJ in her findings of fact found the onset date to be December 15, 2015. AR 15.

On April 22, 2016, Plaintiff visited the emergency room ("ER") at Lutheran Medical Center for shortness of breath and was treated by Thomas G. Burke, M.D. AR 386. Plaintiff had a history of hyperthyroidism, cellulitis of the lower leg, MRSA infection, asthma and hypertension. AR 387. She was a former smoker, smoking "a pack a day for forty years," and she reported to the doctor that she consumed twenty-eight cans of beer per week. *Id.* At that time, Plaintiff complained of severe back pain and increased lower extremity edema. AR 356. Due to an upper respiratory infection, she had been prescribed Prednisone several weeks prior. AR 389. Dr. Burke noted that he suspected the symptoms were related to an exacerbation of chronic obstructive pulmonary disease ("COPD") and discharged her on the same day with a recommendation for her to follow up with a pulmonology specialist. AR 389.

On May 3, 2016, Philip Emrie, M.D., administered a pulmonary function test. AR 505. The test measured Plaintiff's forced expiratory volume ("FEV") values which determines the amount of air Plaintiff can forcibly blow out in one second. The test revealed that she did not have FEV values below 2.00. *Id.* The findings of the test indicated no pulmonary edema, pleural effusion, or pneumoflorax. AR 506. On May 21, 2016, Plaintiff visited the ER at Lutheran Medical Center again for back and neck pain and was treated by Joanne Marie Edney, M.D. AR 396. She was released the same day with a recommendation to see a primary care physician, instructions on dietary changes that could help her edema, and a small prescription for pain. AR 400. The records from May 21, 2016 indicate Dr. Edney's final impressions were that Plaintiff suffered from chronic bilateral low back pain without sciatica and bilateral lower extremity edema. *Id.*

On June 3, 2016, Plaintiff visited the ER at Lutheran Medical Center complaining of

shortness of breath and a fever and was treated by Ethan M. Ross, D.O. AR 407. She was admitted to the hospital for further "pulmonary toileting." AR 411. On June 4, 2016, Plaintiff underwent an echocardiogram due to her history with COPD, hypertension, and acute hypoxemic respiratory failure. AR 353. There was no specific diagnosis or finding reported from the echocardiogram. *Id.* However, on an ambulatory challenge, she was unable to walk more than ten feet due to "respiratory distress and tachycardia." AR 411. She was released from the hospital on June 4, 2016. AR 412.

On June 28, 2016, Plaintiff visited the ER at Lutheran Medical Center complaining of difficulty breathing and was treated by a Nathan P. Karber, M.D. AR 428. She was released the same day after a finding that there was no evidence of acute cardiopulmonary disease. *Id.*; AR 432. Dr. Karber's final impression was that she was suffering from shortness of breath and hyponatremia. AR 432.

On October 11, 2016, Plaintiff had a follow-up appointment with Dr. Emrie. AR 759. His notes indicate that Plaintiff was unsuccessful in losing weight, she suffered from dyspnea on exertion, back and neck pain, and intermittent numbness and weakness in her arms. *Id.* Dr. Emrie reported that Plaintiff suffered from COPD related to her history of smoking and restrictive lung disease related to obesity. AR 760. At that appointment, she underwent another pulmonary function test which showed FEV values at 1.98 pre-bronchodilator and 2.06 post-bronchodilator. AR 504.

On October 19, 2016, Plaintiff was independently evaluated by Ronald J. Jendry, M.D. AR 378. Dr. Jendry diagnosed Plaintiff with COPD with the reactive component and nonradicular neck and lower back pain with arm and hand pain. AR 383. Dr. Jendry also noted

probable osteoarthritis. *Id.* The FEV values for the spirometry report in Dr. Jendry's evaluation seven days after the last evaluation were 1.37 pre-bronchodilator and 1.29 post-bronchodilator. AR 375. Dr. Jendry's examination showed that Plaintiff had strength of "5/5 bilateral upper and lower extremities to include grip and pincer" and that she was "sensate to soft touch" meaning that she could perceive and feel soft touches. AR 382. Dr. Jendry found that Plaintiff could stand and walk for about twenty minutes each per day (one-third of an eight-hour period). AR 383. There were "no recommended limitations regarding the number of hours that she should be able to sit during a normal eight-hour workday." *Id.* Dr. Jendry recommended that manipulative activities could be performed only "occasionally during a normal eight-hour workday." *Id.*

On November 16, 2016, Plaintiff visited the Center for Spine and Orthopedics complaining of whole-body aches and lower back pain. AR 482–484. She was seen by Anton Zaryanov, D.O. *Id.* Dr. Zaryanov found that Plaintiff showed signs of lumbar stenosis with neurogenic claudication, most likely related to L3-4 level anterolisthesis. AR 484. He recommended she begin physical therapy and undergo an MRI. *Id.* Further, the report indicated Plaintiff had symptoms consistent with cervical radiculopathy and possibly myelopathy. *Id.* On November 25, 2016, Benjamin Aronovitz, M.D. diagnosed Plaintiff with "multilevel mild disc bulging with mild C3-C4 and mild C4-C5 central canal stenosis." AR 488.

On December 3, 2016, Plaintiff visited the ER at Lutheran Medical Center complaining of shortness of breath and a nonproductive cough and was treated by Jason M. Bellows, M.D. AR 442. Dr. Bellows released her the same day with a diagnosis of exacerbated COPD. AR 447. On December 9, 2016, she had a follow-up appointment at the Center for Spine and Orthopedics with Dr. Zaryanov. AR 486. Dr. Zaryanov found that Plaintiff suffered significant neural

compression and instability at the L3-4 level. *Id.* He determined the best course of action was to pursue physical therapy and weight loss, with surgery for decompression and fusion if those failed. *Id.*

On April 6, 2017, Plaintiff visited the ER at Lutheran Medical Center complaining of cellulitis of the lower left extremity and was treated by Jeffrey S. Beckman, M.D. AR 1143. Dr. Beckman admitted her to the hospital for inpatient care from April 6, 2017 to April 10, 2017 to treat cellulitis, sepsis, and leukocytosis. AR 755. Plaintiff visited Swedish Medical Center on April 10, 2017, hours after being discharged from Lutheran Medical Center, complaining that the redness and swelling of the cellulitis was worsening and not improving. AR 782. In addition, she reported that she had increasing shortness of breath as well as tactile fever and chills. *Id.* Mary Cecilia Nguyen, D.O. diagnosed her with acute hypoxic respiratory failure, diastolic congestive heart failure ("CHF"), moderate pulmonary hypertension, cellulitis, hypertension, acute kidney injury ("AKI"), and COPD. AR 771, 812-13. Dr. Nguyen further listed tinea pedis, scabies, and chronic back pain as diagnoses. AR 822. Plaintiff was discharged from Swedish Medical Center on April 15, 2017. AR 763.

On April 18, 2017, Plaintiff visited SCLP Thornton Medical Center and saw Tejas Balendo Tripathi, M.D. to establish care following her hospitalization. AR 670. On April 28, 2017, she returned to see Dr. Tripathi for a rash and pruritis. AR 676. Dr. Tripathi recommended treating the symptoms with Benadryl. *Id.* On May 22, 2017, she again visited Dr. Tripathi for a follow-up regarding potential congestive heart failure. AR 682. The treatment plan was to continue with her current medication and present for an echocardiogram. *Id.* On June 8, 2017, at a follow up visit, Dr. Emrie assessed Plaintiff as having COPD, acute exacerbation of COPD,

and restrictive lung disease. AR 497. A pulmonary function report conducted that same day by Dr. Emrie showed Plaintiff's FEV values above 2.0. AR 503. On June 12, 2017, Plaintiff presented for an echocardiogram to Dr. Benedict. AR 507. The echocardiogram showed her pulmonary pressures had dropped to the low 40s and that her diastolic function has improved as well. AR 508. The doctor listed Plaintiff's pulmonary hypertension as a concern at that time. AR 517.

On August 30, 2017, Plaintiff visited Carol Ann Oakleaf, P.A.-C for vascular dermatitis with early cellulitis in her right shin. AR 689. She was instructed to try remedy repair creams. *Id.* Two months later, on October 30, 2017, Plaintiff visited Dr. Tripathi for a medication refill, chronic pain syndrome, and a cough. AR 697. Dr. Tripathi refilled her current medications. *Id.* On November 6, 2017, she again visited Dr. Tripathi for a worsening cough. AR 704. The doctor instructed her to rest. *Id.* Fourteen days later, Plaintiff visited Shawna Morgan, P.A.-C for chest congestion and shortness of breath. AR 710–711. Ms. Morgan recommended her for direct admission to St. Joseph's Hospital due to lower extremity swelling and acute dyspnea and hypoxia. AR 710. Plaintiff was discharged the next day on December 1, 2017; Stephanie Wilson, M.D. sent her home with steroids and oxygen for use with activity. AR 560–561. Four days later, on December 5, 2017, she had a follow-up on the hospital visit with Dr. Tripathi. AR 718. At the this visit, Dr. Tripathi counseled Plaintiff to take Spiriva and an additional inhaler. AR 719. She was also advised to increase her dosage of Metoprolol and discontinue Amlodipine. *Id.* At that time, Dr. Tripathi informed Plaintiff she would qualify for a handicap placard for parking based on her oxygen needs. *Id.*

Plaintiff had an additional follow-up with Dr. Tripathi on December 13, 2017. AR 725.

Dr. Tripathi noted that Plaintiff's breathing had improved, and her lower extremity edema had improved since stopping Amlodipine. *Id.* However, Dr. Tripathi noted that she was oxygen dependent. *Id.* On January 31, 2018, she had an additional follow up at which Dr. Tripathi recommended increasing her dose of Advair in hopes it would decrease her oxygen needs. AR 733. On February 27, 2018, Plaintiff visited Dr. Tripathi regarding pain in her shoulders, neck, and lower back. AR 660. Dr. Tripathi prescribed Gabapentin. *Id.*

## II.     Procedural History

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on August 1, 2016 AR 13. She later filed a Title XVI application for supplemental security income. *Id.* The ALJ and Plaintiff agree that both claims were denied initially on November 15, 2016. *Id.*; Compl. 2, ECF 1. Plaintiff then filed a written request on December 1, 2016 for a hearing before an ALJ. AR 13. She appeared and testified at the hearing on March 26, 2018. *Id.*

The ALJ subsequently issued an opinion holding that Plaintiff was not disabled. AR 13–23. According to the ALJ, although Plaintiff had severe impairments, they did not meet the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 16. The ALJ also held that, despite Plaintiff's limitations, she was capable of performing her past work as an admissions clerk as generally performed, even if not as she actually performed it. AR 21–22.

The SSA Appeals Council subsequently denied Plaintiff's request for reversal on remand, adopting the ALJ's decision as the final decision. Compl. 2, ECF 1. Plaintiff timely appealed the ALJ/Commissioner's final decision to this Court. *Id.*

### III.    Hearing Testimony

The ALJ held a hearing regarding Plaintiff's application on March 26, 2019. AR 28–75. Plaintiff and a vocational expert testified at the hearing. AR 28. Plaintiff testified that she stopped working because she could no longer walk; she had worked as a counselor representative at a college and testified that the job required her to conduct tours around the campus about ten times per day. AR 35–36. She then testified that about half of her day was spent giving tours and the other half spent either sitting at her desk or performing office tasks such as making copies or getting supplies. AR 37. She would also administer tests to students. AR 38. Ultimately, she testified that she was on her feet for more than half of the day at her job. AR 37. Plaintiff also testified that she would fly to trainings in other states "about three times a year maybe." *Id.* She stated that the last training to which she traveled was embarrassing for her because she was unable to walk through the airport or carry her own suitcase. *Id.*

Plaintiff testified that at the end of 2015 and the beginning of 2016 she was missing work about every three weeks due to hospitalization. AR 40. She testified that she was off work for a week each time she was hospitalized, then had to return to work immediately. *Id.* She stated that the "VPs" of the college told her she would have to take Family Medical Leave Act ("FMLA") leave. AR 41. She stated that she was planning to take FMLA leave, but she got sicker during this time. *Id.* She was having to lean on walls to give tours and sit down in every classroom they visited. *Id.* Further, she stated that she had to receive daily nebulizer treatments (for about fifteen minutes) from the "respiratory director" at work. *Id.* She also stated that she would use rescue inhalers two times a day. AR 43. Plaintiff testified that around this time (end of 2015 and beginning of 2016), the school was not paying her correctly and there were some "discrepancies"

about her income which she indicated may have been relevant to her choice to quit work rather than take FMLA leave. AR 41. She described that she experienced "excruciating pain" in her back, shoulders, and arms and that her right hand and left arm would go numb. AR 43. She further testified that her right hand would feel numb about ten times per day for about fifteen minutes, and that she could not lift her right arm above her shoulder. AR 43–45. She also testified that the numbness in her left arm "lasts a long time." AR 45. Plaintiff testified that the numbness in her hand would make it difficult to type and that she was in a lot of pain at work. AR 46. Further, she stated that she has arthritis. AR 45. She described herself as having "right-handed heart failure." AR 46. Plaintiff testified that doctors had stated her heart failure was the result of COPD because she had previously been a smoker. AR 47. At the hearing, Plaintiff was on oxygen and she testified that she had been on oxygen on and off for the last year. *Id.* She testified that carrying around the oxygen tank was difficult on her back and that the canister of oxygen only lasts her about an hour and a half. AR 48. Because of the oxygen, Plaintiff stated that she does not leave the house. AR 48–49.

When asked what activities she could no longer perform, Plaintiff testified that she used to paint her house, wipe down the cupboards, keep her home "spotless," create sculptures and artwork, and play guitar, piano, and the violin. AR 50. Specifically, Plaintiff stated that it had been about four or five years since she played the violin, but also that she played it off and on after that. AR 51. She testified that she recently gave her guitars away because the arthritis in her fingers and back made it difficult to play. *Id.* She further stated that working on a computer or playing piano caused her shoulder pain that led to her hand feeling numb. AR 52.

Plaintiff also testified that she had restless leg syndrome at night and that her legs felt

numb three or four times a day due to an injury to her back and spine from a car accident in 2014 or 2015. AR 53. She testified that the injuries from the car accident got worse over time. AR 54. She further stated that she could not walk upstairs or downstairs, but she could walk up three stairs to get into a building. AR 55. Plaintiff further testified that she had a difficult time walking over rough or uneven ground, but she did not walk with any assistive device. *Id.* She stated that the furthest she could walk before being out of breath was from her seat to the door—about twenty feet. *Id.* She also stated that she could wash dishes only "a little bit"—about five minutes—before she had to sit down. *Id.*

The ALJ then questioned Plaintiff. AR 57. Plaintiff stated that her emergency room visits were usually because she needed "extra treatment." AR 58. Plaintiff told the ALJ that the cellulitis was under control, so the remaining physical challenges were her back and breathing. *Id.* She also stated that she was not currently receiving any injections for her back, but cortisone shots would be the next step. *Id.* Plaintiff stated that she had "shards" in her neck. AR 59. The ALJ asked her about whether she had heart failure and Plaintiff stated that she did, and that she was on potassium water pills for high blood pressure. AR 59–60. She stated that she also had stage three or four kidney failure. AR 60. She stated that she lived with a little boy and her brother who is mentally disabled. AR 61. Plaintiff testified that no one else helped care for the boy and her brother; however, she also asserted that her daughter came every day to clean and do laundry. AR 61–62. Further, Plaintiff testified that her brother mowed the lawn and shoveled the snow. AR 62. She also stated that she did the grocery shopping at Walmart using a cart and her brother helped unload the groceries when she got home. AR 62. Though Plaintiff stated that she did not cook much, she also stated that she had to feed everyone, so she used the microwave and

the stove. AR 62–63. She testified that she was able to drive, but that it was "awful" because she could not lift up her right arm. *Id.* She also stated that she has grandchildren who came to visit and one grandson got her water. *Id.* Plaintiff asserted she could sit for about fifteen to twenty minutes before having to get up and move around. She then testified that she slept about five or six hours at night and had to lay down for about an hour during the day. AR 64–65. Plaintiff stated that she did not need help getting in or out of the shower or getting dressed. AR 65. Finally, Plaintiff stated that she did not go out or engage in outside activities. AR 65–66.

The ALJ then questioned the vocational expert, Mr. Schwager, who testified that based on the record and the testimony of Plaintiff, her past work would be classified as "admissions clerk, college." AR 67. He stated that the job was classified as sedentary and that Plaintiff performed it at a light level. The ALJ then posed a hypothetical to Mr. Schwager:

> [a]ssume that the individual is limited to sedentary work, but would need to be able to alternate between sitting and standing every 30 minutes for a brief position change while continuing to work at the workstation. Could do no overhead reaching with the right upper extremity. Need to do no more than frequent fingering and no more than occasional stoop, crouch, and never kneel, or crawl. Rarely climb stairs and never ladders, ropes, or scaffolds. With those limitations would the hypothetical individual be able to perform the past job as you identified.

AR 68. Mr. Schwager responded that such individual would be able to perform the job as the DOT outlines it, but would not be able to perform the job as it was performed by Plaintiff. *Id.* He testified that the DOT job would still be able to be performed if the individual was on oxygen. *Id.* Further, he stated that while the job could still be performed if the individual needed an additional fifteen-minute break per day, it could not be performed if the individual needed two additional fifteen-minute breaks per day. *Id.* Moreover, if the individual needed to leave early or be absent two workdays a month on a consistent basis, the individual would not be able to

perform the job or any competitive employment. *Id.*

When asked by Plaintiff's attorney whether there was another job in the DOT that better described Plaintiff's previous work and would take into account that she gave tours for about half of the day, Mr. Schwager stated that there was not. AR 70. He also stated that he had only studied the job as it existed in Montana and not Colorado. *Id.* The attorney asked him whether a person could perform the DOT job if they needed to lie down for one hour and he stated that that would only be possible if it could be accommodated during the lunch hour. AR 71. He testified, however, that employers do not typically provide places for their employees to lie down. *Id.* Further, he stated that colleges and universities do not generally provide nebulizer treatments for their employees. *Id.* The attorney then asked Mr. Schwager what the required time on task would be for Plaintiff's previous job and he stated that she would need to be on task ninety percent of the time. *Id.* He also testified that any additional breaks over thirty minutes would not be compatible with the job and neither would be needing to stand for thirty minutes and sit for thirty minutes at a time. AR 72.

The ALJ issued an unfavorable decision on August 1, 2018. AR 10–27.

<u>**LEGAL STANDARDS**</u>

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(i), 423, 1382.

## I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social

Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *Id.* Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education, and work experience. *See* 20 C.F.R. § 404.1520(g).

## II.     Standard of Review

The Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). But, in all cases, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## THE ALJ'S RULING

The ALJ first ruled that Plaintiff met the insured status requirements of the Social Security Act. AR 15. Next, the ALJ determined that Plaintiff had not engaged in substantial gainful employment since December 15, 2015, which is the alleged onset date. *Id.* At step two, the ALJ held that Plaintiff had the following severe impairments: (1) chronic obstructive

pulmonary disorder; (2) asthma; (3) obesity; (4) degenerative disc disease of the lumbar spine; (5) degenerative disc disease of the cervical spine; (6) mild degenerative disc disease of the thoracic spine; (7) hyponatremia; (8) hypoxia; (9) cellulitis; (10) congestive heart failure; and (11) chronic pain syndrome. AR 15–16.

Moving to step three, the ALJ found Plaintiff's impairments or combination of impairments did not medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 16. First, the ALJ found that Plaintiff's condition did not meet the requirements of Listing 1.04, regarding disorders of the spine, due to a lack of evidence of nerve root compression, motor loss, sensory or reflex loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. *Id.* Further, the ALJ found that Plaintiff's condition did not meet Listing 3.02, regarding chronic respiratory disorders, because she did not have FEV values equal to or less than 1.65, chronic impairment of gas exchange, or significantly abnormal blood gas valves.[1] *Id.* Next, the ALJ found that Plaintiff's condition also failed to meet Listing 3.03, regarding asthma, because she did not have FEV values equal to or less than 1.65 or evidence of asthma attacks in spite of prescribed treatment requiring physician intervention, which occurred at least once every two months or at least six times per year. *Id.* Finally, the ALJ found that Plaintiff's condition did not meet the requirements of Listing 4.02, regarding chronic heart failure while on a regimen of prescribed treatment, because there was insufficient evidence to show Plaintiff had chronic heart failure.

---

[1] This Court takes note of the fact that the ALJ appears to have made a typographical error regarding the requirement of FEV values under listing 3.02A. Though the ALJ lists the FEV value requirement to be 1.65, based on Plaintiff's height, age, and gender, Listing 3.02A requires FEV values below 1.25. 20 C.F.R Part 404, Subpart P, Appendix 1, § 3.02A. However, the lowest FEV values in the record for Plaintiff are 1.37 pre-bronchodilator and 1.29 post-bronchodilator, thus, she still does not meet the requirements of Listing 3.02A. AR 375.

At step four, the ALJ held that Plaintiff had an RFC to perform sedentary work. AR 16. Specifically, the ALJ found that Plaintiff could perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) with the following exceptions:

> [Plaintiff] must be able to alternate between sitting and standing every thirty minutes for a brief position change while continuing to work at the work station; cannot reach overhead with the right upper extremity; can frequently finger; can occasionally stoop and crouch and never kneel or crawl, she can rarely climb stairs and never climb ladders, ropes, or scaffolds, she requires the use of oxygen at work, and she requires an additional break of fifteen minutes once a day.

AR 17.

The ALJ found, based on Plaintiff's testimony, she had "medically determinable impairments that could reasonably be expected to cause the alleged symptoms." AR 18. The ALJ held that Plaintiff's weight—without more—would not be disabling; however, the ALJ found that Plaintiff's weight in combination with her other impairments "significantly limits her ability to do basic work activities." *Id.* The ALJ found that the medical evidence was sufficient to support Plaintiff's pain and dyspnea but concluded that her "treatment history is not consistent with the presence of disabling limitation." AR 19. Specifically, the ALJ found that the treatment was consistent with some limitation, including that Plaintiff was unable to perform strenuous work due to her low oxygen levels. AR 20. However, the fact that oxygen use made a significant difference for Plaintiff showed that she did not have a disabling limitation. *Id.* The ALJ found that Plaintiff's need for oxygen and the medical treatment records indicated that she would need to change positions every thirty minutes, use oxygen while at work, and required an additional fifteen-minute break above those customarily allowed at work. *Id.* Further, the ALJ found that Plaintiff's treatment history was consistent with the finding that she was capable of lifting up to ten pounds occasionally, walk or stand for two out of eight hours, frequently finger, and

occasionally stoop or crouch. *Id.*

The ALJ recognized that Plaintiff described her ability to perform daily activities as "limited" but found three factors weighed against this being strong evidence of a disability. *Id.* First, the ALJ noted that these activities could not be verified with any certainty. AR 21. Second, there was no ability to definitively attribute her supposed degree of limitation to her medical conditions rather than other factors. *Id.* Third, Plaintiff described activities that she was capable of doing that were inconsistent with her other testimony. *Id.* For example, Plaintiff could dress and bathe herself, drive, cook, clean, and even cared for a six-year-old child and her disabled brother. *Id.* Therefore, the ALJ found the evidence of limited daily activities was outweighed by these factors. *Id.*

The ALJ then discussed how the various medical opinions affected the RFC determination. AR 21. The ALJ characterized Dr. Jendry as the "[c]onsultative examiner." *Id.* The ALJ gave partial weight to Dr. Jendry's opinion that Plaintiff

> could lift 10 to 30 pounds; carry 10 pounds; sit for 20 minutes at a time, and for one third of an eight-hour workday total; could walk for 20 minutes at a time, and for one-third of an eight-hour work period; and could occasionally reach, push, pull, handle, grasp, finger, and feel.

*Id.* The ALJ based this decision on the fact that the opinion was "rendered after a single examination . . . and is somewhat consistent with those exam findings and the exam findings of the claimant's treating providers." *Id.* The ALJ found that the manipulative limitations that Dr. Jendry endorsed were unsupported by any exam findings. *Id.* In contrast, the ALJ gave "great weight" to the opinions of Michael Canham, M.D. and Michael Weaver, M.D., the State agency physicians who reviewed Plaintiff's file. *Id.* Dr. Canham and Dr. Michael concluded that Plaintiff could perform "sedentary work with occasional postural activity." *Id.*

Lastly, the ALJ found Plaintiff was capable of completing the duties of an admissions clerk as that position is generally performed in the national economy. AR 21. The ALJ rejected Plaintiff's argument that the vocational expert's categorization of the job was incorrect because it was a composite job. AR 22. The ALJ noted there were conflicting statements about how much walking and standing her previous job required. *Id.* Thus, the ALJ held it was unclear whether her job required the amount of walking and standing that Plaintiff described at the hearing. *Id.* Further, Plaintiff failed to present any evidence other than lay testimony that her job was a composite job. *Id.* Finally, the ALJ found that even if Plaintiff's previous job had required more than two hours of walking and standing, the job as generally performed would not require that amount of walking and standing and could be performed at a sedentary level. *Id.*

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors by the Commissioner: (1) determining that Plaintiff's combined impairments did not meet or medically equal the requirements of a listing as set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) making inadequate findings regarding the functional effects of Plaintiff's chronic pain and her other subjective symptoms, and assigning RFC restrictions related almost exclusively to her objective symptoms; and (3) not affording weight to opinion evidence based on substantial evidence and not adequately addressing the relevant factors set forth in the regulations. Opening Br. 19–30.

## ANALYSIS

### I.     The ALJ's Discussion of Whether Plaintiff's Combined Impairments Meet or Medically Equal a Listing

Plaintiff first contends that the ALJ erred in not considering whether Plaintiff's *combined* impairments equal a listing. Opening Br. 19–20. Specifically, she states the ALJ did not consider

or discuss alternative D to Listing 3.02. *Id.* 20. Further, she states that even if her COPD does not meet Listing 3.02D, her *combination* of impairments equal the severity of a listed impairment. *Id.* Defendant contends that Plaintiff does not meet Listing 3.02D. Resp. Br. 7, ECF 17. The Court agrees that the ALJ did not err in holding that Plaintiff's impairments or combination of impairments did not equal Listing 3.02D.

Notably, Plaintiff states that her combination of hospital visits "appears" to meet the requirements of Listing 3.02D. Opening Br. 21. Listing 3.02D requires:

> exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart (the 12-month period must occur within the period we are considering in connection with your application or continuing disability review). Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization.

20 C.F.R Part 404, Subpart P, Appendix 1, § 3.02D. Plaintiff has only been hospitalized for forty-eight hours or more twice according to the record and those stays were not thirty days apart. AR 755, 782, 763. In fact, the stays were less than twenty-four hours apart as Plaintiff was admitted to Swedish Medical Center just hours after she was released from Lutheran Medical Center. *Id.* Therefore, the ALJ's holding that Plaintiff's conditions do not meet Listing 3.02D is supported by substantial evidence.

Plaintiff further claims that even if her conditions do not meet the requirements of Listing 3.02D, they come so close to doing so that when combined with her other impairments, her conditions equal a listing. Opening Br. 21. Plaintiff specifically alleges that "the ALJ was required to take expert medical evidence and make findings as to whether Plaintiff's multiple severe impairments combined to equal a listing." *Id.* 22. However, the ALJ is required to obtain updated medical evidence only: "(1) if the ALJ concludes that the claimant does not meet the

specific criteria outlined in the Listing but reasonably believes claimant's impairments may be judged equivalent, or (2) the ALJ receives additional medical evidence that he believes may change the state agency medical or psychological consultant's findings that the impairments are not equivalent in severity to any impairments in the Listing." *Bailey v. Astrue*, 4:08–CV–500–Y, 2009 WL 3614503, at *11 (N.D. Tex. Nov. 2, 2009) (citing SSR 96–6p, 1996 WL 374180, at *4). Here, the ALJ did not conclude that she reasonably believed Plaintiff's impairments could be judged as equal to a listing, and there is no record of additional medical evidence that would change the opinion of the existing medical evidence. Therefore, the ALJ was not required to obtain expert medical evidence regarding whether Plaintiff's impairments combine to equal a listing.

Moreover, even if the ALJ had made a finding that expert medical testimony was required, the existing medical evidence addressed the combination of Plaintiff's impairments. Specifically, Dr. Jendry diagnosed her with COPD with the reactive component and nonradicular neck and lower back pain with arm and hand pain. AR 383. This diagnosis explicitly addresses the combination of Plaintiff's impairments. Further, Dr. Canham evaluated Plaintiff's combination of impairments (listing breathing problems/COPD, arthritis, and obesity). AR 86. Moreover, in Dr. Weaver's concurrence with Dr. Canham he states, "since the effects of obesity on lung function are measured by spirometry this would not be an additional limitation justifying an equals." AR 82. Therefore, all three medical opinions addressed the combination of Plaintiff's impairments. Thus, substantial evidence supports that the ALJ did consider the combination of Plaintiff's impairments, and, further, that she was not required to obtain additional medical testimony.

## II.     The ALJ's Discussion of Plaintiff's RFC

Plaintiff next contends the ALJ's decision regarding her RFC was not supported by substantial evidence of her objective and subjective symptoms, and the ALJ failed to apply the correct legal test to determine her RFC. Opening Br. 26. Defendant contends that the ALJ's evaluation of Plaintiff's subjective and objective symptoms was consistent with SSR 16-3p. Resp. Br. 9. This Court agrees with the Defendant.

Specifically, Plaintiff alleges the ALJ erroneously assigned RFC restrictions related "almost exclusively" to her objective, rather than subjective symptoms. Opening Br. 22–23. Plaintiff alleges that her subjective symptoms were pain and fatigue. *Id.* With respect to fatigue, this Court cannot locate in the record an allegation that Plaintiff cannot work due to fatigue, and she does not cite such allegation. Opening Br. 23. At the hearing, Plaintiff's only mention of sleep, tiredness, or fatigue occurred when she stated that she slept five to six hours at night and napped for one hour per day. AR 64–65. The only other testimony at the hearing regarding the difficulty that fatigue could place on Plaintiff's ability to work occurred in the questioning of Mr. Schwager, in which he noted the potential inability for Plaintiff to find a resting place at work and to take an hour-long break at work. AR 71. In the ALJ's decision, she specifically noted that Plaintiff took an hour nap during the day and found that Plaintiff's symptoms were not entirely consistent with the medical evidence. AR 18. This Court can find no evidence in the record reflecting that Plaintiff was medically required to take an hour-long nap per day; rather, she chose to do so. Therefore, the ALJ's holding regarding Plaintiff's RFC limitations was supported by substantial evidence. Further, the ALJ specifically noted that Plaintiff would need an additional fifteen-minute break during the day over those customarily allowed, which would

account for some level of fatigue above that of someone without Plaintiff's impairments. AR 20.

Next, the ALJ explicitly took into account Plaintiff's subjective symptom of pain. AR 20. She noted that Plaintiff was on a number of medications for pain and that the degree of treatment regarding her pain and other symptoms was consistent with some degree of limitation. *Id.* She further noted, though, that Plaintiff did not use any braces or pain-relieving garments for her back and did not use an assistive device for walking. AR 20. Utilizing these factors, the ALJ accounted for Plaintiff's subjective pain by stating that she would need to change positions every thirty minutes at work due to pain. *Id.* In analyzing Plaintiff's subjective and objective symptoms, the ALJ pointed to specific medical evidence that accounted for Plaintiff's pain, then discussed how the treatment history regarding her pain was not consistent with the presence of a disabling limitation. AR 18–20. She followed the same method for analyzing Plaintiff's difficulty with walking. AR 20.

Plaintiff also alleges that the ALJ made an improper adverse credibility determination regarding Plaintiff's statements about her daily activities. Opening Br. 22–24. Findings of credibility should be "closely and affirmatively linked to substantial evidence." *Huston v. Bowen*, 838, F.2d 1125, 1133 (10th Cir. 1988). Where the link between the evidence and the credibility determination is missing, a case should be remanded. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Here, however, that link is not missing. The ALJ cites the exact daily activities that call into question the presence of any disabling limitation: Plaintiff could dress and bathe herself without assistance, she could drive, cook, and clean, and she took care of a six-year-old child and her disabled brother. AR 21. Further, the ALJ noted that she did not consider these inconsistencies alone, and that while they did not "ipso facto" show an inability to engage

in a work activity, they did suggest that Plaintiff had a greater ability to function than she claimed. *Id.* Therefore, the ALJ's credibility determination was closely linked to substantial evidence.

Finally, Plaintiff claims that the ALJ did not apply the correct legal test under SSR 16-3p, 20 C.F.R § 404.1529(c)(3), and § 416.929(c)(3). The ALJ cited these exact rules in her analysis and applied them in the determination of Plaintiff's RFC. AR 17–20. Plaintiff's mere disagreement with the ALJ's application of the law to the facts does not mean the ALJ applied the incorrect legal test. The ALJ, though not listing the factors in 20 C.F.R § 404.1529(c)(3) and § 416.929(c)(3) explicitly, addressed each in turn. *Id.* These factors are: (1) "daily activities"; (2) "location, duration, frequency, and intensity of your pain or other symptoms"; (3) "precipitating and aggravating factors"; (4) "type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate you pain or other symptoms"; (5) "treatment, other than medication, you receive or have received for relief of your pain or other symptoms"; (6) "any measures you use or have used to relieve your pain or other symptoms"; and (7) "other factors." 20 C.F.R § 416.929(c)(3). The ALJ listed Plaintiff's testimony regarding her daily activities as well as her testimony regarding her own pain and symptoms. AR 17. Further, the ALJ stated that giving tours had been a precipitating event for Plaintiff's pain while she was employed. *Id.* She discussed the medications that Plaintiff took for her pain. AR 20. Though she did not delineate the dosage of those medications or the side effects, she took the medications and their effectiveness into account when determining that Plaintiff would need to change positions every thirty minutes at work for her pain. AR 20. The ALJ specifically noted the *lack of* other treatment Plaintiff received for her pain. *Id.* Therefore, the Court finds the ALJ applied the

correct legal test and considered each of the elements of that test. AR 17–20.

### III.    The ALJ's Discussion of Medical Opinion Evidence

Plaintiff contends that the weight given by the ALJ to the medical opinion evidence in the record was erroneous. Opening Br. 26. Defendant contends that the "great weight" given to Dr. Canham's opinion and the "partial weight" given to Dr. Jendry's opinion was based on substantial evidence. Resp. Br. 13–16. This Court again agrees with the Defendant.

In weighing the medical opinions in this case, 20 C.F.R. § 404.1527 applies.[2] Six factors guide the ALJ's assignment of weight to varying medical opinions: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. § 404.1527. Under the first factor, examining physicians are presumptively entitled to more weight. *Chapo v. Astrue*, 682 F. 2d 1285, 1291 (10th Cir. 2012). Therefore, Dr. Jendry's opinion was presumptively entitled to more weight. *Id.* However, an examining physician's opinion can be given less weight based on an evaluation of all of the factors outlined in the regulation. *Id.* Here, the ALJ noted that Dr. Jendry's opinion was rendered after a single examination. AR 21. Further, she found that Dr. Jendry's opinion was inconsistent with the findings of Plaintiff's treating providers. *Id.* Specifically, Dr. Jendry's findings regarding Plaintiff's manipulative limitations did not have support in the record and were, therefore, inconsistent with the medical evidence. *Id.* When weighing these various factors together, the ALJ found that Dr. Jendry's opinion should be given only partial weight. *Id.* Thus, the ALJ's analysis was supported by substantial evidence and overcame the presumption that the examining physician in this case should be given greater weight.

Moreover, the ALJ outlined the factors that supported giving great weight to Dr. Canham

and Dr. Weaver's opinions. *Id.* First, their qualifications as State agency medical and psychological consultants weighed in favor of granting their opinions strong weight. *Id.* Further, the ALJ concluded that their opinions, unlike Dr. Jendry's, were consistent with the medical evidence in the case. *Id.* Therefore, the ALJ's assignment of great weight to Dr. Canham and Dr. Weaver's opinions is based on substantial evidence and properly analyzed under the factors outlined in 20 C.F.R. § 404.1527.

Plaintiff contends, though, that the opinion by Dr. Jendry was based on substantial evidence and, therefore, should have been given more weight. Opening Br. 29. Moreover, Plaintiff argues that the opinions of Dr. Canham and Dr. Weaver's opinions were not based on substantial evidence. Opening Br. 28–29. To the extent Plaintiff argues that the ALJ erred in assigning partial weight to Dr. Jendry's opinion because there was substantial evidence of manipulative limitations, the Court disagrees. Dr. Jendry's report shows that his examination found Plaintiff to have a strength of "5/5 bilateral upper and lower extremities to include grip and pincer" strength and that Plaintiff was "sensate to soft touch" meaning that she was able to perceive even soft touch despite claiming that she experienced numbness. AR 382. Therefore, there is substantial evidence that Dr. Jendry's exam findings did not support his own conclusion regarding Plaintiff's manipulative limitations. To the extent Plaintiff argues that the *medical opinions* relied on in this case were based on speculation rather than substantial evidence, that is not a question for this Court to decide. Rather the question is whether the ALJ's opinion was based on substantial evidence. It would be improper for this Court to re-weigh the medical opinion evidence in this case or to make a determination as to whether the opinions themselves were based on substantial evidence. Therefore, the Court concludes the ALJ's assignment of

---

[2] Because Plaintiff's claim was filed on August 1, 2016, 20 C.F.R. § 404.1527 applies. AR 13.

weight to the medical opinions in this case was based on substantial evidence.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court concludes the ALJ did not err in determining that Plaintiff did not have impairments that equaled a listing, when assigning an RFC to Plaintiff, or when assigning weight to the medical evidence. The ALJ considered the combination of all of Plaintiff's impairments including both her objective and subjective symptoms. The Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied. Therefore, the decision of the ALJ that Plaintiff Maria D. Deherrera was not disabled and the final order of the Commissioner are **affirmed**.

Dated at Denver, Colorado this 23rd day of March, 2020.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge